**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| STEVEN TURNER | ) | CASE NO. |
| 221 Mulberry Ct | ) | |
| Fort Thomas, KY 41017 | ) | JUDGE: |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **COMPLAINT FOR DAMAGES** |
| | ) | **AND INJUNCTIVE RELIEF** |
| FREESTORE FOODBANK, INC. | ) | |
| 112 E Liberty St | ) | **JURY DEMAND ENDORSED** |
| Cincinnati, OH 45202 | ) | **HEREIN** |
| | ) | |
| **Serve also:** | ) | |
| Freestore Foodbank, Inc. | ) | |
| c/o Tim Weidner (Stat. Agent) | ) | |
| 1250 Tennessee Ave | ) | |
| Cincinnati, OH 45229 | ) | |
| | ) | |
| -and- | ) | |
| | ) | |
| ANNE PEZEL | ) | |
| c/o Freestore Foodbank, Inc. | ) | |
| 112 E Liberty St | ) | |
| Cincinnati, OH 45202 | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Plaintiff Steven Turner, by and through undersigned counsel, as his Complaint against the

Defendants, states and avers the following:

**PARTIES**

1. Turner is a resident of the city of Fort Thomas, Campbell County, state of Kentucky.

2. Defendant FREESTORE FOODBANK, INC. ("Freestore") is an Ohio-based non-profit

    that conducts business throughout the states of Ohio, Indiana, and Kentucky, though the

events that give rise to the claims for relief in this Complaint occurred at its location at 112 E. Liberty Street, Cincinnati, OH 45202, and at its warehouse locations.

3. Freestore is, and was at all times hereinafter mentioned, Turner's employer within the meaning of Americans with Disability Act ("ADA") 42 U.S.C. § 12101, Age Discrimination in Employment Act of 1967 ("ADEA") 29 U.S. Code § 634 et seq., Family and Medical Leave Act ("FMLA") 29 U.S.C. § 2617 *et seq.*, R.C. § 4112.01(A)(2), and R.C. § 4113.52.

4. Upon information and belief, Defendant Anne Pezel is a resident of Ohio.

5. Pezel is, and was at all times hereinafter mentioned, a manager, supervisor, and/or agent of Freestore, and as such, an employer within the meaning of R.C. § 4112.01(A)(2).

## JURISDICTION & VENUE

6. This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 in that Turner is alleging federal law claims under the FMLA, the ADA, and the ADEA.

7. This Court has supplemental jurisdiction over Turner's state law claims pursuant to 28 U.S.C. § 1367, as Turner's state law claims are so closely related to his federal law claims that they form part of the same case or controversy under Article III of the United States Constitution.

8. Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

9. Within 180 days of the conduct alleged below, Turner filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC", Charge No. 473-2019-01170) against Freestore ("EEOC Charge").

10. On or about June 17, 2019, the EEOC issued and mailed a Dismissal and Notice of Rights letter to Turner regarding the EEOC Charge.

11. Turner received the Dismissal and Notice of Rights from the EEOC in accordance with 42 U.S.C. § 2000e-5(f)(1), which has been attached hereto as Plaintiff's Exhibit 1.

12. Turner has filed this Complaint on or before the 90-day deadline set forth in the Dismissal and Notice of Rights.

13. Turner has properly exhausted all administrative remedies pursuant to 29 C.F.R. § 1614.407(b).

## FACTS

14. Turner is a former employee of Freestore.

15. Turner worked for the Freestore, ending as an inventory specialist, from January 23, 2017, until Freestore terminated Turner's employment on or about February 5, 2019.

16. Turner is 65 years old and had a Worker's Compensation claim while employed with Freestore (discussed *infra*), placing him in protected classes for his age and disability respectively.

17. Turner's wife also has Type-1 Diabetes, and so Turner is also in a protected class for disability by association with his spouse.

18. On or about January 23, 2017, Turner was hired at Freestore as the warehouse operations manager.

19. Turner had plenty of relevant experience and had a key role implementing the new R-F warehouse management system. Turner was hired in at $50,000 salary.

20. In or around early summer 2017, Turner had his first performance evaluation and was rated overall quite positive.

21. At the time, Michael Torsell (director of distribution, early 40s) was on his way out of his role.

22. Because Turner was directly under Torsell, Turner assumed he would be next in line for Torsell's director position. That promotion was also implied by Brian Weichert (VP of food bank operations, has since left Freestore).

23. Turner's early employment remained overall positive until Anne Pezel (late 40s) was hired to the chief operating officer position in or around early summer 2017.

24. Immediately after her hire, Pezel commented on an older employee (Ben Pennington, around age 65), that Pennington was too old and slow to continue working in the warehouse.

25. As Turner was only slightly younger than Pennington, this gave him concern about Pezel.

26. Turner pushed back, saying it was not Pennington's fault and the role took time to learn.

27. Around that same time, Turner applied for Torsell's previous role, but Pezel refused to promote him as she thought Turner was "not ready" for the role.

28. Pezel also demoted Weichert to a compliance role around that time.

29. In or around late summer 2017, Turner was told by Pezel and Valarie Boykins (VP of HR, early 50s) that his position as warehouse operations manager was being eliminated and they would understand if he needed some time to find a new job.

30. Turner wished to remain at the Freestore, and so asked how he could make that happen.

31. Freestore then offered to create a position in inventory for him (inventory specialist) and noted it would be lower base pay but would allow for overtime (base pay: $21.63 per hour).

32. Turner mulled it over for a few weeks, realized he needed to keep his insurance benefits, and took the new role.

33. Turner's wife has Type 1 Diabetes, which was an important factor that influenced Turner to accept the demotion to the inventory specialist role.

4

34. Turner and his wife consistently meet their deductible each year due to Mrs. Turner's Diabetes; his family's medical costs likely played into his later termination.

35. Turner's wife needed a new insulin meter at the time, but Freestore pushed back as the equipment was expensive.

36. Turner's wife called United Way (Freestore's medical benefits administrator) to discuss the issue in or around autumn 2017. The insulin meter was labeled as "durable medical equipment" and was then covered.

37. In or around August 2017, Freestore was involved in The Emergency Food Assistance Program ("TEFAP") work for the US Department of Agriculture ("USDA"), managed by the Ohio Department of Job and Family Services ("ODJFS").

38. TEFAP program has numerous strict guidelines, but as Freestore is a non-profit, it is an important grant the organization uses each year.

39. One TEFAP rule is that non-profits must manage their inventory from TEFAP material and may only have a six-month supply on-hand, so that the stock can follow proper rotation protocol to prevent any product from expiring, thus leading to spoilage, potential product recall, and potentially even serious harm to recipients of the food stock.

40. Non-profits were then to deliver their TEFAP product to small agencies for distribution.

41. At that time, Turner received a complaint from one of Freestore's recipient-agencies that some of the orange juice it had delivered was discolored and therefore posed a risk of being contaminated or spoiled.

42. Turner mentioned this to Pezel in a managerial meeting and Freestore decided it would discard the juice in question (approximately $80,000 worth).

43. Pezel and others then concocted a scheme to create fake orders to Customer Connection Center to account for the depleted stock of orange juice, then dumped the orange juice.

44. Turner questioned Pezel's decision, as Weichert had told him never to lie to the federal government, and Turner refused to involve himself any further in the situation.

45. Pezel moved forward with the fraudulent plan anyway.

46. Turner later reported this scheme in writing to the USDA, in or around May 2018.

47. In or around September or October 2017, Aaron Ginn was hired over Turner as director of distribution.

48. Ginn was less qualified for the position and younger than Turner.

49. Ginn began poaching his former employees from McLane Foodservice (Turner had been told all new hires must come from Bellflex, owned by one of Freestore's board of directors). The new hires represented a departure from prior Freestore hiring policy.

50. Around the same time, Steven Thompson (also hired by Ginn, age 38) assumed the role that Turner had held as warehouse operations manager, Turner's previous position that Freestore purportedly had eliminated.

51. By around May 2018, Turner began to notice that many of Ginn's newer hires from McLane would leave work prior to the end of their eight-hour shifts.

52. Turner discussed the early departures with some of the workers. They told him that Ginn would allow them to clock out and leave early but would still count their hours at 45 per week.

53. This scheme actually included Turner who was also being paid for the 45 hours per week but was only working 40.

54. That month, Turner reported the overpayment to HR, who took no action.

55. Because of the lack of action, Turner also reported the overpayment to the US Department of Labor Division of Wages and Hours, who turned him away.

56. After Turner was turned away, he also reported it to the Ohio Attorney General's office.

57. Turner's whistleblowing upset Freestore, including Boykins who ended up yelling at him about the whistleblowing.

58. Going forward, Freestore (via Ginn) repeatedly changed Turner's job duties and piled more duties onto him. Ginn also continued asking Turner when he would retire.

59. Turner was also moved to a less-desirable second shift schedule. As it happened, the new schedule often required Turner to work by himself, with no other employees in his work area.

60. Turner then filed a letter with Freestore asking for some sort of security or other person to work at the same time in case he had some sort of medical issue while at work.

61. Around that time in a meeting, Turner mentioned how he had also made reports to the USDA and Ohio Attorney General and how he was now facing a hostile working environment because of the whistleblowing. Turner reported the same to HR (Brian Bradford, 30s).

62. In or around late summer 2018, Turner applied for and was granted intermittent FMLA leave to help with his wife and her medical issues.

63. Turner had a lot of issues in getting his FMLA granted, and eventually needed his son (an attorney) to help him with the process.

64. HR repeatedly returned the documents to Turner saying they were "incomplete."

65. Eventually, Turner's wife had to call the Department of Labor ("DoL"), who said to have HR call them.

66. Turner's wife emailed HR about this, who said they would not call the DoL.

67. The DoL then helped ensure the FMLA documents were completed fully. After Turner's attorney-son got involved, his FMLA was granted.

68. In or around August 2018, Turner was working alone in Freestore's northern Kentucky warehouse, where it regularly reached near 100 degrees Fahrenheit.

69. In the process, Turner suffered heat exhaustion. Turner called off the next day to seek treatment from his doctor, who made the diagnosis.

70. In response, Freestore issued Turner a verbal warning for his poor attendance, which caused him to file a Worker's Compensation claim for the heat exhaustion, which was granted in or around September 2018.

71. Also in or around August 2018, Turner received another performance evaluation, his first evaluation noting anything other than a positive review.

72. Freestore also placed Turner on a performance improvement plan ("PIP") for being under a 2.5 rating overall.

73. Disparately, younger, able-bodied, non-whistleblowing, non-FMLA using employees who did not apply for or receive Worker's Compensation benefits were not placed on PIPs for the same performance rating.

74. On or about November 30, 2018, Turner had his second meeting about his PIP.

75. Turner had fully met his PIP requirements at that time and reported so to Ginn.

76. Ginn denied this, saying that Turner was late one day during his PIP.

77. Ginn was referencing an occasion on which Turner presented to work one minute late in order to help with his wife's medical condition that morning.

78. Ginn reissued Turner's PIP, added another 60 days to it, and added more criteria.

79. Turner's next PIP meeting date was set for February 5, 2019.

80. On or about February 5, 2019, Ginn told Turner he had failed to meet his PIP again.

81. Turner denied this, and Ginn cited an inventory issue.

82. The inventory issue was an orchestrated effort by Ginn to set up Turner to fail and to create a pretextual basis for his termination.

83. Ginn oddly asked Turner to take inventory of a bin that was no longer in use, either arranging for or knowing that another employee had mistakenly entered an order regarding that bin. When Turner deleted the erroneous item from the order, Ginn accused him of failing to report a loss of product (which did not actually occur).

84. More specifically, an agency requested an order from Freestore for donated produce (#910, produce donated at no costs), but the item was labeled as #10, which is Vienna sausages.

85. This resulted in a loss shown of approximately $2,900 and resulted in Turner's termination. Notably, there was no item in bin 001 anyway, and there was a key-punch error (outside of Turner's control).

86. Despite the obvious falsity in Ginn's reasoning, he fired Turner that day anyway.

87. Turner faced several adverse employment actions due to his age, disability (and by association), FMLA-usage, Worker's Compensation claim, and whistleblowing, including the failure to promote him to director of distribution, his demotion to inventory specialist, and later his termination.

88. Pezel and Ginn repeatedly asked him when he was to retire, and he was treated disparately because of his age and disability (including by association).

89. Upon information and belief, Turner was replaced by someone outside his protected classes.

90. Turner was also (at least temporarily) disabled due to his Worker's Compensation injury.

91. Further, Turner's wife was a substantial money sink for Freestore's insurance. These facts also played into Turner's termination.

92. Turner also faced the same adverse employment actions due to his complaints of bullying, harassment, and disparate treatment.

93. Freestore failed to promote Turner after he complained, it demoted him after he complained, and it eventually fired him after he complained.

94. Shortly after Turner requested, and had approved, intermittent FMLA for his wife, his employment was terminated.

95. Further, Freestore also did its best not to give Turner FMLA in the first place. Freestore both interfered with and retaliated against Turner for his FMLA.

96. After Turner suffered heat exhaustion and filed a Worker's Compensation claim, Freestore slowly moved toward terminating his employment.

97. Turner also blew the whistle on multiple illegal and/or unethical activities, both verbally and in writing.

98. After doing so, Freestore created a pretextual basis for Turner's termination in retaliation for his whistleblowing.

99. Also notable, numerous stores in the area, (including but not limited to, Kroger, Castellini, Crossett, Amazon, Sams, and Meijer's), often donated spoiled and bug-infested product to Freestore as well.

100.    Those companies received a tax write-off for the donations, but as the donations were unusable, Freestore had to simply dump the goods increasing its dumpster charges.

Turner also reported this to his supervisors on numerous occasions, both verbally and in writing.

101. Turner also reported his harassment and disparate treatment to Freestore's HR shortly before his termination.

102. Turner, before his termination from Freestore, began teaching a LIFT class in conjunction with Gateway Community College. Based on his performance as a teacher, Turner pursued an opportunity to join Gateway's faculty as a full-time teacher of the course.

103. Freestore sent a retaliatory job reference to Gateway, causing Turner to lose the opportunity of that teaching position.

104. Defendants' purported reason for Turner's termination is pretextual.

105. Defendants actually terminated Turner's employment discriminatorily against his age, disability (including by association), in retaliation for his complaints of disparate treatment, in retaliation for his FMLA usage, in retaliation or prevention of his Workers' Compensation claim, and/or in retaliation for whistleblowing complaints.

106. As a result of being wrongfully terminated from Freestore, Turner has suffered damages, including economic damages, as well as severe emotional distress, anxiety, and depression.

## COUNT I: VIOLATION OF OHIO WHISTLEBLOWER STATUTE R.C. § 4113.52
### (Defendant Freestore Only)

107. Turner restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

108.   As set forth above, Turner repeatedly made oral and written reports to Freestore of what he reasonably believed to be illegal and/or unethical activities performed by Freestore.

109.   In the alternative, Turner reasonably believed he was reporting unethical and/or illegal behavior, in violation of the law and company policies, that constituted criminal acts that threatened the public's health or safety.

110.   Turner verbally complained to Defendant regarding this conduct.

111.   Turner complained to Defendant in writing regarding this conduct.

112.   Turner gave Defendant an opportunity to cure the reported misconduct.

113.   Defendant's purported reason for Turner's termination was pretextual.

114.   Defendant retaliated against Turner by terminating his employment based on his complaints regarding this conduct.

115.   Defendant's termination of Turner's employment was in violation of R.C. § 4113.52.

116.   As a direct and proximate result of Defendant's conduct, Turner suffered and will continue to suffer damages, including economic, emotional distress, and physical sickness damages.

## COUNT II: WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY
### (Defendant Freestore Only)

117.   Turner restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

118.   A clear public policy exists and is manifested in Ohio statutes, including R.C. § 4101.11, § 4101.12, and/or § 4113.52, and/or administrative regulations, or in the common

law, in favor of providing workers with a healthy and safe work environment, and against terminating an employee based on complaints of unsafe working conditions.

119.     As set forth above, Turner repeatedly made oral and written reports to Freestore not only about his disparate treatment, but also about the unethical, unlawful, and/or policy-violating behavior that was going on there, including unsafe working conditions.

120.     Defendant's termination of Turner's employment jeopardizes these public policies.

121.     Defendant's termination of Turner's employment was motivated by conduct related to these public policies.

122.     Defendant had no overriding business justification for terminating Turner's employment.

123.     As a direct and proximate result of Defendant's conduct, Turner suffered and will continue to suffer damages.

## COUNT III: WORKER'S COMPENSATION RETALIATION

124.     Turner restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

125.     On or about February 5, 2019, Defendants terminated Turner's employment.

126.     Defendants' purported reason for Turner's termination was pretextual.

127.     Defendants actually terminated Turner in retaliation for Turner filing a claim for Worker's Compensation benefits.

128.     Turner was discharged for filing a claim for Worker's Compensation benefits, Turner is therefore entitled to recover damages from Defendants for Turner's wrongful

discharge in retaliation for filing a claim for Worker's Compensation benefits under R.C. § 4123.90.

129.     As a direct and proximate result of Defendants' conduct, Turner has suffered and will continue to suffer damages, including economic, emotional distress, and physical sickness damages.

### COUNT IV: WRONGFUL TERMINATION AGAINST PUBLIC POLICY

130.     Turner restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

131.     A clear public policy exists and is manifested in Ohio statutes and/or administrative regulations, or in the common law, against terminating an employee to avoid a Workers' Compensation claim.

132.     A clear public policy exists and is manifested in Ohio statutes and/or administrative regulations, or in the common law, against terminating and/or retaliating against an employee because he/she engages in protected activity under Ohio law.

133.     Specifically, in *Sutton v. Tomco Machine*, the Ohio Supreme Court noted "we recognize a common-law tort claim for wrongful discharge in violation of public policy when an injured employee suffers retaliatory employment action after an injury but before he or she files, institutes, or pursues a workers' compensation claim." (*Sutton v. Tomco Machine*, 129 Ohio. St. 3d 153, 163 (2011)).

134.     Defendants terminated Turner's employment on or about February 5, 2019.

135.     Defendants' purported reason for Turner's termination was pretextual.

136.     Defendants actually terminated Turner's employment to prevent a Worker's Compensation claim.

137.     Defendants' termination of Turner jeopardizes these public policies.

138.     Defendants' termination of Turner was motivated by conduct related to these public policies.

139.     Defendants had no overriding business justification for terminating Turner.

140.     As a direct and proximate result of Defendants' conduct, Turner has suffered and will continue to suffer damages, including economic, emotional distress, and physical sickness damages.

## COUNT V:  UNLAWFUL INTERFERENCE WITH FMLA RIGHTS

141.     Turner restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

142.     Pursuant to 29 U.S.C. § 2601 *et seq*., covered employers are required to provide employees job-protected unpaid leave for qualified medical and family situations.

143.     Freestore is a covered employer under the FMLA.

144.     Turner was an employee eligible for FMLA.

145.     During his employment, Turner qualified for FMLA leave due to his and his wife's disabilities.

146.     Defendants refused to provide information about FMLA to Turner.

147.     Defendants unlawfully interfered with Turner's exercise of his rights under the FMLA in violation of § 105 of the FMLA and § 825.220 of the FMLA regulations.

148.     Defendants' refusal to provide Turner with information pertaining to FMLA leave and/or permit Turner to take FMLA leave violated and interfered with his FMLA rights.

149.     As a direct and proximate result of Defendants' conduct, Turner is entitled to all damages provided for in 29 U.S.C. § 2617, including liquidated damages, costs, and reasonable attorneys' fees.

**COUNT VI: RETALIATION IN VIOLATION OF THE FMLA**

150.     Turner restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

151.     During his employment, Turner qualified for and took intermittent FMLA leave.

152.     Defendants knew Turner took FMLA leave.

153.     After Turner utilized his qualified FMLA leave, Defendants retaliated against him.

154.     Defendants terminated Turner on or about February 5, 2019.

155.     Defendants' proffered reason for Turner's termination was pretextual.

156.     There was a causal link between Turner taking medical leave under the FMLA and Defendants' termination of Turner's employment.

157.     Defendants actually terminated Turner for his FMLA use.

158.     Defendants retaliated against Turner by terminating his employment.

159.     Defendants willfully retaliated against Turner in violation of U.S.C. § 2615(a).

160.     As a direct and proximate result of Defendants' wrongful conduct, Turner is entitled to all damages provided for in 29 U.S.C. § 2617, including liquidated damages, costs, and reasonable attorneys' fees.

**COUNT VII: AGE DISCRIMINATION IN VIOLATION OF R.C. §4112, et seq.**

161.     Turner restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

162.     Turner is 65 years old, and thus is in a protected class for his age.

163.     R.C. § 4112 et seq. provides that it is an unlawful discriminatory practice for an employer to discriminate against an employee on the basis of the employee's age.

164.     Defendants treated Turner differently than other similarly situated employees based upon his age.

165.     Defendants violated R.C. § 4112.02 and R.C. § 4112.99 by treating Turner differently from other similarly situated employees outside his protected class.

166.     Defendants violated R.C. § 4112.02 and R.C. § 4112.99 by applying their employment policies in a disparate manner based on Turner's age.

167.     Defendants violated R.C. § 4112.02 and R.C. § 4112.99 by applying their disciplinary policies in a disparate manner based on Turner's age.

168.     Defendants violated R.C. § 4112.02 and R.C. § 4112.99 by failing to promote Turner because of his age.

169.     Defendants' failure to promote Turner was an adverse employment action against him.

170.     Defendants violated R.C. § 4112.02 and R.C. § 4112.99 by demoting Turner because of his age.

171.     Defendants' demotion of Turner was an adverse employment action against him.

172.     Defendants hired people over Turner who were outside Turner's protected class under R.C. § 4112.14(B).

173.     Turner incurred emotional distress damages as a result of Defendants' conduct described herein.

174.     As a direct and proximate result of Defendants' failure to promote Turner based upon race discrimination, Turner has suffered and will continue to suffer damages.

## COUNT VIII: AGE DISCRIMINATION IN VIOLATION OF THE ADEA

175.    Turner restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

176.    Turner is 65 years old, and thus is in a protected class for his age.

177.    The ADEA provides that it is an unlawful discriminatory practice for an employer to discriminate against an employee on the basis of the employee's age.

178.    Defendants treated Turner differently than other similarly situated employees based upon his age.

179.    Defendants violated the ADEA by treating Turner differently from other similarly situated employees outside his protected class.

180.    Defendants violated the ADEA by applying their employment policies in a disparate manner based on Turner's age.

181.    Defendants violated the ADEA by applying their disciplinary policies in a disparate manner based on Turner's age.

182.    Defendants violated the ADEA by failing to promote Turner because of his age.

183.    Defendants' failure to promote Turner is an adverse employment action against him.

184.    Defendants hired multiple people over Turner who were outside Turner's protected class under the ADEA.

185.    Turner incurred emotional distress damages as a result of Defendants' conduct described herein.

186.    As a direct and proximate result of Defendants' failure to promote Turner based upon race discrimination, Turner has suffered and will continue to suffer damages.

## COUNT IX: FAILURE TO HIRE/PROMOTE BASED ON AGE DISCRIMINATION

187.    Turner restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

188.    Turner is 65 years old. At all times relevant, Turner was a member of a statutorily-protected class under R.C. §4112.14(B) and The ADEA for his age.

189.    Throughout his employment, Turner applied for promotions with Freestore.

190.    Turner was fully qualified for each of those opportunities.

191.    Turner was not given any interviews for many of the positions.

192.    Defendants purported reasons for passing Turner over were pretextual.

193.    Defendants actually failed to promote Turner based on his age.

194.    Turner's age was a determinative factor in Defendants' decision not to promote Turner.

195.    Defendants promoted people outside Turner's protected age class in place of Turner.

196.    Defendants violated R.C. §4112.02, R.C. § 4112.99, and The ADEA when they failed to promote Turner based on his age.

197.    Turner incurred emotional distress damages as a result of Defendants' conduct described herein.

198.    As a direct and proximate result of Defendants' failure to promote Turner based upon race discrimination, Turner has suffered and will continue to suffer damages.

## COUNT X: DISABILITY DISCRIMINATION IN VIOLATION OF R.C. § 4112, et seq.

199.    Turner restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

200.    Turner filed a Worker's Compensation claim for heat exhaustion, and thus is in a protected class for his disability.

201.    Turner's wife is also disabled due to her Diabetes, placing Turner in a protected class again for disability by association.

202.    R.C. § 4112 et seq. provides that it is an unlawful discriminatory practice for an employer to discriminate against an employee on the basis of the employee's disability.

203.    Defendants treated Turner differently than other similarly situated employees based upon his disability.

204.    Defendants violated R.C. § 4112.02 and R.C. § 4112.99 by treating Turner differently from other similarly situated employees outside his protected class.

205.    Defendants violated R.C. § 4112.02 and R.C. § 4112.99 by applying their employment policies in a disparate manner based on Turner's disability.

206.    Defendants violated R.C. § 4112.02 and R.C. § 4112.99 by applying their disciplinary policies in a disparate manner based on Turner's disability.

207.    Defendants violated R.C. § 4112.02 and R.C. § 4112.99 by failing to promote Turner because of his disability.

208.    Defendants' failure to promote Turner is an adverse employment action against him.

209.    Defendants hired multiple people over Turner who were outside Turner's protected class under R.C. § 4112.14(B).

210.     Turner incurred emotional distress damages as a result of Defendants' conduct described herein.

211.     As a direct and proximate result of Defendants' failure to promote Turner based upon race discrimination, Turner has suffered and will continue to suffer damages.

### COUNT XI: DISABILITY DISCRIMINATION IN VIOLATION OF THE ADA

212.     Turner restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

213.     Turner filed a Worker's Compensation claim for heat exhaustion, and thus is in a protected class for his disability.

214.     Turner's wife is also disabled due to her Diabetes, placing Turner in a protected class again for disability by association.

215.     The ADA provides that it is an unlawful discriminatory practice for an employer to discriminate against an employee on the basis of the employee's disability.

216.     Defendants treated Turner differently than other similarly situated employees based upon his disability.

217.     Defendants violated the ADA by treating Turner differently from other similarly situated employees outside his protected class.

218.     Defendants violated the ADA by applying their employment policies in a disparate manner based on Turner's disability.

219.     Defendants violated the ADA by applying their disciplinary policies in a disparate manner based on Turner's disability.

220.     Defendants violated the ADA by failing to promote Turner because of his disability.

221.     Defendants' failure to promote Turner is an adverse employment action against him.

222.     Defendants hired multiple people over Turner who were outside Turner's protected class under the ADA.

223.     Turner incurred emotional distress damages as a result of Defendants' conduct described herein.

224.     As a direct and proximate result of Defendants' failure to promote Turner based upon race discrimination, Turner has suffered and will continue to suffer damages.

## COUNT XII: FAILURE TO HIRE/PROMOTE BASED ON DISABILITY DISCRIMINATION

225.     Turner restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

226.     Turner is 65 years old. At all times relevant, Turner was a member of a statutorily-protected class under R.C. §4112.14(B) and the ADA for his disability.

227.     Throughout his employment, Turner applied to several different positions at Defendants.

228.     Turner was fully qualified for each of those opportunities.

229.     Turner was not given any interviews for many of the positions.

230.     Defendants' purported reason for failing to promote Turner are pretextual.

231.     Defendants actually failed to promote Turner based on his disability.

232.     Turner's disability was a determinative factor in Defendants' decision not to promote Turner.

233.     Defendants promoted people outside Turner's protected disability class in place of Turner.

234.     Defendants violated R.C. §4112.02, R.C. § 4112.99, and the ADA when they failed to promote Turner based on his disability.

235.     Turner incurred emotional distress damages as a result of Defendants' conduct described herein.

236.     As a direct and proximate result of Defendants' failure to promote Turner based upon race discrimination, Turner has suffered and will continue to suffer damages.

## COUNT XII: RETALIATION

237.     Turner restates each and every prior paragraph of this complaint, as if it were fully restated herein.

238.     As a result of the Defendants' discriminatory conduct described above, Turner complained of the discrimination, harassment, and disparate treatment he was experiencing.

239.     Subsequent to Turner's complaints to management about harassment, bullying, and disparate treatment toward him, Defendants took adverse employment actions against Turner, including passing over him for promotions.

240.     Defendants' actions were retaliatory in nature based on Turner's opposition to the unlawful discriminatory conduct.

241.     Pursuant to R.C. § 4112.02(I), it is an unlawful discriminatory practice "to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section…"

242.     Turner incurred emotional distress damages as a result of Defendants' conduct described herein.

243.     As a direct and proximate result of Defendants' failure to promote Turner based upon race discrimination, Turner has suffered and will continue to suffer damages.

## DEMAND FOR RELIEF

WHEREFORE, Turner demands from Defendants the following:

a) Issue a permanent injunction:

    i.   Requiring Defendants to abolish discrimination, harassment, and retaliation;

    ii.   Requiring allocation of significant funding and trained staff to implement all changes within two years;

    iii.   Requiring removal or demotion of all supervisors who have engaged in discrimination, harassment, or retaliation, and failed to meet their legal responsibility to promptly investigate complaints and/or take effective action to stop and deter prohibited personnel practices against employees;

    iv.   Creating a process for the prompt investigation of discrimination, harassment, or retaliation complaints; and

    v.   Requiring mandatory and effective training for all employees and supervisors on discrimination, harassment, and retaliation issues, investigations, and appropriate corrective actions;

b) Issue an order requiring Defendants to expunge his personnel file of all negative documentation;

c) An award against Defendants for compensatory and monetary damages to compensate Turner for physical injury, physical sickness, lost wages, emotional distress, and other consequential damages, in an amount in excess of $25,000 per claim to be proven at trial;

24

d) An award of punitive damages against Defendants in an amount in excess of $25,000;

e) An award of reasonable attorneys' fees and non-taxable costs for Turner's claims as allowable under law;

f) An award of the taxable costs of this action; and

g) An award of such other relief as this Court may deem necessary and proper.

<div style="margin-left:40%">

Respectfully submitted,

/s/ Matthew G. Bruce_____
Matthew Bruce (0083769)
     Trial Attorney
Evan R. McFarland (0096953)
**THE SPITZ LAW FIRM, LLC**
8354 Princeton-Glendale Rd., Suite 203,
West Chester, OH 45069
Phone: (216) 291-4744 (x173)
Fax:    (216) 291-5744
Email: Evan.McFarland@SpitzLawFirm.com
Email: Matthew.Bruce@spitzlawfirm.com

*Attorneys for Plaintiff Steven Turner*

</div>

## JURY DEMAND

Plaintiff Steven Turner demands a trial by jury by the maximum number of jurors permitted.

<div style="margin-left:40%">

/s/Matthew G. Bruce_____
Matthew Bruce (0083769)

</div>